**Opinion issued May 7, 2019**



In The

# Court of Appeals

For The

# First District of Texas

_____

## NO. 01-18-01013-CV

_____

## IN THE INTEREST OF I. T., a child

On Appeal from the 315th District Court
Harris County, Texas
Trial Court Case No. 2017-04577J

## MEMORANDUM OPINION

This is an appeal of a judgment terminating the parental rights of L.N.T.

(Laura) to her son, I.T. (Ian).[1] In four issues, Laura contends that there was

---

[1]     The Department sought termination of Laura's parental rights to three children. The trial court severed the portion of the case not directly related to parental rights to I.T. That portion of the case was tried separately. Both parties agree judgment is final.

insufficient evidence to support termination under each of three statutory predicates or to support the best interest finding, in part based on an argument that factual assertions in the clerk's record are not evidence.[2]

We affirm.

## Background

In September 2017, Laura, her boyfriend, and three of her children were living in a hotel room in Houston after being displaced by Hurricane Harvey. The three children were I.T. (Ian, age eight), T.T. (Tracy, age four), and S.T. (Scott, age eight months). Laura had three older children who lived elsewhere with their father. Laura was pregnant with her seventh child.[3]

### Ian's younger brother is injured, and all three children are removed

One afternoon, Scott was seriously injured in the hotel room, and Laura took him to the emergency room for evaluation. Laura told hospital staff that she had intended to lay Scott down for a nap next to Laura's sleeping boyfriend. Laura laid Scott on the hotel bed and turned to walk to the bathroom. She heard a noise, turned,

---

[2]     The parental rights of Ian's father, L.J., were also terminated. L.J. is not a party to this appeal.

[3]     The record indicates a due date for the seventh child of April 8, 2018, which would have been five months before the termination trial. There is no indication in the record whether a child was born on or around that date.

and saw Scott on the floor. She thought he crawled to the edge of the hotel bed and fell to the floor, hitting his head.

The hospital staff determined that Scott's injuries were not consistent with a single impact. He had injuries in more than one location on his head, including a skull fracture, bruising around one eye, and swelling in another area. This collection of injuries indicated that there had been two or three separate impacts. Scott was admitted to the hospital for treatment. The Department of Family and Protective Services was contacted.

The Department interviewed Laura, her boyfriend, Ian, and Tracy. All four provided a consistent explanation of Scott's injuries: he crawled to the edge of the bed and fell. Suspecting child abuse, the Department petitioned to be named temporary managing conservator of Ian, Tracy, and Scott. The trial court granted the petition, noting that Laura had been notified of the conservatorship hearing but did not appear. The Department placed Ian and Tracy in foster care. After his release from the hospital, Scott was placed in a different foster home.

The next month, the trial court ordered drug testing on Laura. Laura tested positive for marijuana, phencyclidine (PCP), and cocaine. Monthly drug testing began. The Department also requested that Laura be ordered to follow the Department's family services plan.

*Laura's family services plan*

Laura's November 2017 family services plan stated that she had tested positive for drugs and, due to that drug use, "is not a capable caregiver" and cannot provide "quality care to her children." It further stated that, due to "several reports of neglectful supervision and drug use[,] there is an identifiable pattern of maltreatment." Further, due to "a history of drug use and domestic violence in the home[,] there is concern for the home an[d] social environment." The plan identified goals for Laura, including demonstrating a willingness and ability to protect her three children from harm. The plan also listed tasks required of Laura, including:

- parenting classes for six to eight weeks with certification of completion, as well as demonstration of learned skills;
- psychosocial evaluation with honest and accurate provision of information and adherence to recommendations;
- substance-abuse assessment with honest and accurate provision of information and adherence to recommendations;
- attendance at all court hearings, permanency conferences, and family visits;
- random urine and hair sample drug testing;
- maintenance of safe and stable housing, along with proof of housing; and
- maintenance of legal and verifiable employment, with proof of employment.

A few months later, in March 2018, a trial court order noted that Laura had been appearing at permanency hearings, and it found that she had "demonstrated adequate and appropriate compliance with the service plan."

4

### *Laura's participation suddenly diminishes around May 2018*

In advance of a June 2018 permanency hearing, the appointed ad litem reported to the trial court that Laura had missed her most recent visit with her children. Then, in August, the Department reported to the trial court that Laura "is not in contact with the agency." It further stated that Laura's "whereabouts are currently unknown," she "has not been compliant with random drug testing," she "has yet to complete a substance abuse assessment," and she has not provided a "certificate of completion for parenting classes." Thereafter, citing Laura's lack of participation, her failed drug tests in late 2017, and another failed drug test in March 2018, the Department sought termination of Laura's parental rights to all three children.[4]

### *Termination proceeding begins as to Ian only*

The hearing on the Department's petition to terminate parental rights as to Ian, Tracy, and Scott was scheduled for September 5, 2018, approximately one year after Scott's injuries. Instead of adjudicating conservatorship as to all three children that day, the trial court adjudicated the parental rights as to Ian only.

---

[4]     As noted earlier, the record indicates a due date for Laura's seventh child in April 2018. While it is unclear, on this record, whether a child was born around that time, we note that Laura's level of participation in visits with her children and appearances for drug testing changed drastically around the time of the due date.

The record indicates that a father of one of the two other children only recently had made contact with the Department and that an attorney for an unknown father was not available for trial that day. The Court noted its ability to proceed "on the parties who are before the court since the court has the authority to sever cases out." The Department's attorney informed the court that trial on its petition to terminate the parental rights of Laura and L.J. as to Ian only would take no more than "20 or 30 minutes." The trial court proceeded with trial as to Laura's and L.J.'s parental rights to Ian.

Both Laura and L.J. were represented by counsel, but neither parent was present in the courtroom or testified. Laura's counsel noted on the record that Laura was absent but confirmed that Laura had been "well aware of the trial setting." She did not object to proceeding with trial without Laura present. No explanation was given for either parent's absence.

Trial lasted just under one and one-half hours with only three witnesses: Department caseworker N. Adams, Child Advocates volunteer S. Frelier, and Ian's foster mother.

***Evidence presented at termination proceeding***

Adams testified without objection that Scott suffered a skull fracture under circumstances that were "unsure." The Department did not seek to admit Scott's medical records to establish the severity of his injuries or to place in evidence the

doctors' evaluations or diagnoses. The Department, instead, relied on Adams's testimony and internal Department documents admitted into evidence. According to Adams, based at least in part on the emergency room's evaluation of Scott's injuries as compared to Laura's explanation of them, the Department suspected neglectful supervision and physical abuse. The Department's disposition for both concerns was "reason to believe." Adams did not explain how the Department reached this resolution.

Adams testified that, before their removal by the Department, Ian and his siblings were living with Laura and Laura's boyfriend in a hotel room. Laura indicated that her boyfriend "was abusive to her."

Adams testified that Laura "had a drug issue" and that Ian's father, L.J., who lived elsewhere, had suggested to Adams that Laura has "always struggled" with drugs. Adams testified that Laura tested positive for "marijuana, PCP, cocaine, and meth" when the children were removed. Since then, the Department referred Laura for substance-abuse treatment "four or five" times. Adams testified that Laura started three substance-abuse programs but never completed any. Laura tested positive for drugs several times, even after starting the substance abuse programs. According to Adams, Laura's most recent failed drug test was on March 29, 2018—about six months after removal of the children. Since that failed test, Laura has failed to show up for her monthly drug tests. She missed tests in April, May, June, July, and August

2018, according to Adams. Laura's family services plan provides that the Department considers a "no show as a positive test result."

The drug test results were admitted into evidence. They indicate an October 9, 2017 urinalysis drug test that was positive for marijuana metabolites and phencyclidine but negative for other tested substances, and an October 9 hair-analysis drug test that was positive for cocaine; a second positive urinalysis drug test on October 23 for marijuana metabolites that was negative for other tested substances; a third positive urinalysis test on November 6 for marijuana metabolites that was negative for other tested substances; and a positive hair-analysis drug test on March 9, 2018 for methamphetamine and cocaine. There is evidence in the record that, in addition to the drug tests Adams discussed, Laura had negative urinalysis drug tests between December 2017 and March 2018.

Adams testified that Laura completed the psychosocial evaluation required by her family services plan. The evaluator recommended various parenting classes, therapy sessions, and counseling, as well as "a long-term psychiatrist to help her work on her life skills." According to Adams, Laura's family service plan also required her to follow the evaluator's recommendations, which Laura did not do.

Adams agreed that Laura was receiving Social Security Income due to a disability. There was no evidence regarding the nature of the disability. Adams noted

8

that Laura only provided SSI information from a single month with no on-going documentation to indicate steady receipt of funds.

Adams also agreed that Laura had been living primarily in shelters during the early pendency of the case and later with family members. The shelters provided some services that aligned with Laura's family services plan requirements, but Laura did not complete her services. To Adams's knowledge, Laura also never obtained stable housing or employment.

Adams discussed Ian's history before removal and progress since. She said that Laura had never provided stable housing for Ian. Based on information provided to her by Laura, Adams estimated that Laura and her children had moved "more than ten times" in the past eight years. As a result, Laura was unable to keep steady employment and Ian was unable to finish a single school year at one school. According to Adams, Ian has dyslexia and learning issues, which are being addressed at his current school. None of Ian's school records were admitted into evidence.

According to Adams, when Ian was removed, he and Tracy had severe tooth decay. Ian has had multiple dental procedures to address the decay and will require dental surgery. As Adams explained, Ian had to have some teeth pulled and others capped in an effort to "save what they can save and find relief." Like with Scott's medical care, the Department did not seek to admit any dental records for Ian or

Tracy. Thus, there is no basis from which to determine whether the decay was due to inadequate dental hygiene or a possible genetic or other physical anomaly.

Adams discussed Laura's interactions with Ian after his removal. Laura consistently attended scheduled visits with Ian until May 2018. Her visits were appropriate. Laura would bring toys and food. She did not exhibit any alarming behaviors during the visits. But, at the time of trial, she had not seen Ian in four months.

Laura contacted the Department once, in July 2018, to tell Adams that she was living with a relative in Beaumont, Texas. Laura told Adams that she would ask her relative to give her a ride to her drug testing appointments and to Houston to visit Ian and the other children. But Laura did not appear for any subsequent drug tests or child visits. Nor did she call Adams again to make other arrangements. Adams agreed that it was "detrimental" to Ian that "his mother doesn't . . . make the effort to go see him."

Adams explained Ian's current living situation. He and Tracy are together in an adoptive foster home. Their younger brother, Scott, is in a different foster home. At the time of trial, Ian was nine years old, in elementary school under a Section 504 accommodations plan for children with learning differences, and adjusting well to his foster family. He was receiving necessary dental treatment and biweekly play therapy. He was in boy scouts and enjoyed playing with friends in his foster family's

neighborhood. He was, according to Adams, "way better from when he came into care."

Adams testified that Ian's foster mother and Scott's foster mother arranged visits among the three children. The siblings had maintained their bond. According to Adams, it would be detrimental to remove Ian from his foster home. He had bonded with the family, they loved him, and they wanted to adopt him and Tracy. Adams testified that it was in Ian's best interest that Laura's (and L.J.'s) parental rights be terminated because it would "finally" give Ian "a chance to have permanency." She elaborated: "I don't believe he's ever lived in the same place for more than six months at a time, never completed a school year."

The next witness to testify was S. Frelier, a Child Advocates representative. Frelier testified that termination of Laura's parental rights was in Ian's best interest because Laura failed to fulfill her court-ordered obligations under the family services plan, had not been in contact with the Department in months, had not appeared for family visits, and had "opted to leave the state rather than pursuing . . . communication and meaningful relationships with" Ian and her other children. Frelier understood that Laura had moved back to Baton Rouge, Louisiana at some point, where she had family, which was "very concerning" because it made it "quite difficult to maintain family visits" with Ian and his siblings. But Frelier agreed that, during the visits that had occurred, Laura was appropriate with the children.

11

Frelier noted that Ian was well bonded with his foster family, receiving services at his then-current school, playing with neighborhood friends, and doing well. Frelier stated that there was "affection" between Ian and his foster family, calling the home a "good place" for him. Frelier concluded, "I think it would just break his heart to have to leave that."

The final witness was Ian's foster mother. She testified that Ian's behavior improved while under her care. He continued to be bonded with Scott. She planned to continue contact with Scott's foster parents so that all three siblings could maintain visits. She testified that it would be detrimental to remove Ian from her home. She planned to adopt him, raise him, and provide him safety and stability.

When asked about Scott living in a different foster home, she testified that she "prefer[red] school-age children" but would agree to take Scott too if the Department required it to approve the adoption of Ian and Tracy. She expressed a willingness, under either path, to continue the relationship between the siblings.

After closing arguments, the trial court announced its rendition. The trial court found that the Department had met its burden to establish a basis for termination under predicates (D), (E), and (O) and that termination was in Ian's best interest.[5]

---

[5] Because Tracy and Scott were not the subject of the trial, Laura and those two children's fathers retained their parental rights to them. Only the parental rights to Ian were terminated. The result of the severance, trial on parental rights to Ian only, and entry of a judgment terminating Laura's parental rights to only one of the three children under the Department's conservatorship has been that Tracy has continued

The trial court entered a final judgment terminating Laura's parental rights to I.T. Laura appealed.

## Parental Termination

In three issues, Laura argues that there is insufficient evidence to support any of the three predicate findings or the best interest finding. In a fourth issue, she argues that factual assertions in the clerk's record are not evidence for purposes of a sufficiency review and thus must be disregarded in the Court's analysis.

### A. Standard of review

A parent's rights to the "companionship, care, custody, and management" of his or her children are constitutional interests "far more precious than any property right." *Santosky v. Kramer*, 455 U.S. 745, 758–59 (1982); *see In re M.S.*, 115 S.W.3d 534, 547 (Tex. 2003). A termination decree is final, irrevocable, and permanently divests the parent of all legal rights, privileges, duties, and powers with respect to the parent-child relationship, except for the child's right to inherit. *Holick v. Smith*, 685 S.W.2d 18, 20 (Tex. 1985). We strictly scrutinize termination proceedings and strictly construe the involuntary termination statutes in favor of the parent. *Id.* However, "the rights of natural parents are not absolute" and the "rights of

---

to have the possibility of regularly scheduled visits with Laura post-judgment while her brother, Ian, who lives in the same foster home, has not. Laura argues that separate trials and the resulting disparate situations for the siblings has not been in their best interest.

parenthood are accorded only to those fit to accept the accompanying responsibilities." *In re A.V.*, 113 S.W.3d 355, 361 (Tex. 2003). Recognizing that parents may forfeit their parental rights by their acts or omissions, the primary focus of any termination suit is protection of the child's best interest. *Id.*

Due to the severity and permanency of the termination of parental rights, the evidence supporting termination must meet the threshold of clear and convincing evidence. TEX. FAM. CODE § 161.001(b); *In re J.F.C.*, 96 S.W.3d 256, 263 (Tex. 2002). "'Clear and convincing evidence' means the measure or degree of proof that will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established." TEX. FAM. CODE § 101.007. This is an intermediate standard that falls between "preponderance of the evidence" used in ordinary civil proceedings and "reasonable doubt" used in criminal proceedings. *State v. Addington*, 588 S.W.2d 569, 570 (Tex. 1979).

This heightened burden of proof results in a heightened standard of review. *In re S.R.*, 452 S.W.3d 351, 358 (Tex. App.—Houston [14th Dist.] 2014, pet. denied). When the legal sufficiency of the evidence supporting termination is challenged, the reviewing court looks at all the evidence in the light most favorable to the termination finding to determine whether a reasonable trier of fact could have formed a firm belief or conviction that the finding was true. *In re J.O.A.*, 283 S.W.3d 336, 344 (Tex. 2009); *In re J.F.C.*, 96 S.W.3d at 265–66. The court must assume

14

that the factfinder resolved disputed facts in favor of its finding if a reasonable factfinder could do so. *In re J.O.A.*, 283 S.W.3d at 344; *In re J.F.C.*, 96 S.W.3d at 266. It should disregard all evidence that a reasonable factfinder could have disbelieved or found to be incredible. *In re J.O.A.*, 283 S.W.3d at 344; *In re J.F.C.*, 96 S.W.3d at 266. If, after conducting a legal sufficiency review of the evidence, the court determines that no reasonable factfinder could have formed a firm belief or conviction that the matter to be proved was true, the court must conclude that the evidence on that matter is legally insufficient. *In re J.O.A.*, 283 S.W.3d at 344–45; *In re J.F.C.*, 96 S.W.3d at 266.

Only when the factual sufficiency of the evidence is challenged does the reviewing court review disputed or conflicting evidence. *In re J.O.A.*, 283 S.W.3d at 345; *In re J.F.C.*, 96 S.W.3d at 266. "If, in light of the entire record, the disputed evidence that a reasonable factfinder could not have credited in favor of the finding is so significant that a factfinder could not reasonably have formed a firm belief or conviction, then the evidence is factually insufficient." *In re J.F.C.*, 96 S.W.3d at 266. We give due deference to the factfinder's findings, and we cannot substitute our own judgment for that of the factfinder. *In re H.R.M.*, 209 S.W.3d 105, 108 (Tex. 2006) (per curiam). The factfinder is the sole arbiter when assessing the credibility and demeanor of witnesses. *Id.* at 109. We are not to "second-guess the trial court's resolution of a factual dispute by relying on evidence that is either disputed, or that

15

the court could easily have rejected as not credible." *In re L.M.I.*, 119 S.W.3d 707, 712 (Tex. 2003).

A single predicate finding under Section 161.001(b)(1) of the Family Code is sufficient to support a judgment of termination when there is also a finding that termination is in the child's best interest. *In re A.V.*, 113 S.W.3d 355, 362 (Tex. 2003). Thus, if multiple predicate grounds are found by the trial court, we may affirm on any one ground because only one is necessary for termination of parental rights. *See In re T.G.R.-M.*, 404 S.W.3d 7, 13 (Tex. App.—Houston [1st Dist.] 2013, no pet.).

## B.    Predicate findings

As explained below, we conclude there is legally and factually sufficient evidence to support termination under Subsection (O). In this circumstance, we generally omit evaluation of the other predicates on which termination was based. *Id.* Laura requests that we review all predicates given the future implications—for her parental rights to Tracy and Scott as well as her other children—of an affirmed judgment of termination based on Subsection (D) or Subsection (E). *See* Tex. Fam. Code § 161.001(b)(1)(M) (providing that trial court may terminate parent-child relationship if parent has "had his or her parent-child relationship terminated with respect to another child based on a finding that the parent's conduct was in violation of Paragraph (D) or (E) or substantially equivalent provisions of the law of another

16

state" and termination is in best interest of child); *see also In re S.G.F.*, No. 14-16-00716-CV, 2017 WL 924541, at \*4 (Tex. App.—Houston [14th Dist.] Mar. 7, 2017, no pet.) (mem. op.) (reviewing termination under Subsections (D) and (E) under similar argument).

### 1. Subsection (O)

An individual's parental rights may be terminated under Subsection (O) if (1) the Department has been the child's temporary managing conservator for at least nine months, (2) the Department took custody of the child as a result of an emergency removal for child abuse or neglect, (3) a court issued an order establishing the actions necessary for the parent to obtain the return of the child, and (4) the parent did not comply with the court order. TEX. FAM. CODE § 161.001(b)(1)(O); *In re S.M.R.*, 434 S.W.3d 576, 582 (Tex. 2014). Laura challenges the sufficiency of the evidence only as it relates to her compliance with the family services plan.

The defined goals in Laura's family services plan included that she would "demonstrate the willingness and ability to protect her children from harm," "understand the serious nature of the situation that placed the child in harms way," and "demonstrate the ability to put the needs of the children ahead of [her] own." To achieve those goals, the plan required Laura to complete specific tasks, including maintaining stable housing and income; completing parenting classes; undergoing a

17

psychosocial evaluation and following all recommendations including therapy; participating in a substance-abuse assessment and following all recommendation; providing urine and hair samples for random drug testing with the knowledge that any "no show" would be treated by the Department as "a positive test result"; and attending court hearings, permanency conferences, and family visits.

Adams testified that Laura did not complete any of her family services plan requirements. The requirement that Laura came the closest to completing was the psychosocial evaluation. Laura participated in the evaluation, but she did not complete any of the evaluator's recommendations, even though compliance with recommendations was an additional requirement of her family services plan. Laura continued to fail drug tests. She also failed to complete her substance-abuse assessment. This evidence is sufficient to support a firm conviction or belief that Laura did not satisfy the requirements of her family services plan.

Laura argues that absolute compliance with the family services plan is not required because, under Section 161.001(d), a court may not order termination under Subsection (O) for failure to comply if the parent proves by a preponderance of evidence that the parent made a good-faith effort but was unable to comply with a specific provision and her failure is not attributable to any fault of her own. *See* TEX. FAM. CODE § 161.001(d); *see also In re A.J.H.*, No. 01-18-00673-CV, 2019 WL 190091, at *6–7 (Tex. App.—Houston [1st Dist.] Jan. 15, 2019, no pet.) (mem. op.).

18

Laura did not, however, put on evidence of an inability or a good-faith effort to comply with the family services plan. Laura appeared at trial only through her attorney. She did not testify. The record indicates Laura was expecting another child in April 2018, which was just one month before her participation in this case severely diminished. But Laura did not present any evidence that she had a baby around that time or that the delivery and care of the baby impacted her ability to meet her plan's requirements. She did not make that argument to the trial court or to this Court on appeal. Even if she had, there still is no evidence explaining why Laura failed to meet even a single plan requirement between the implementation of the plan in November 2017 and the anticipated delivery date in April 2018. During that time, Laura began three substance-abuse programs yet finished none.

Even if the Section 161.001(d) defense is available despite Laura never raising it at the trial court—an issue we do not reach—Laura failed to present any evidence in support of the defense. *See In re A.J.H.*, 2019 WL 190091, at *6–7 (similarly rejecting argument for defense under Section 161.001(d) because parent did not present evidence in support of defense).

We conclude there is legally and factually sufficient evidence to support a firm conviction or belief that Laura failed to comply with the family services plan. *See In re C.M.C.*, No. 14-12-00186–CV, 2012 WL 3871359, at *5 (Tex. App.—Houston [14th Dist.] Aug. 30, 2012, pet. denied) (mem. op. on reh'g)

19

(concluding evidence was legally and factually sufficient to terminate based on caseworker's testimony regarding parent's failure to comply with family services plan). Therefore, there is legally and factually sufficient evidence to support termination of Laura's parental rights to Ian under Subsection (O), if in Ian's best interest.

Before turning to best interest, we consider predicates underlying the potential for a future Subsection (M) termination.

### 2. Subsection (E): endangering conduct

The trial court also terminated Laura's parental rights to Ian under subsection (E) of the Family Code. Subsection (E) provides for termination of parental rights if the parent has "engaged in conduct . . . which endangers the physical or emotional well-being of the child." TEX. FAM. CODE § 161.001(b)(1)(E). Within the context of Subsection (E), endangerment encompasses "more than a threat of metaphysical injury or the possible ill effects of a less-than-ideal family environment." *Tex. Dep't of Human Servs. v. Boyd*, 727 S.W.2d 531, 533 (Tex. 1987). To "endanger" means to expose a child to loss or injury or to jeopardize a child's emotional or physical health. *Id.*; *see In re M.C.*, 917 S.W.2d 268, 269 (Tex. 1996).

It is not necessary to establish that a parent intended to endanger a child to support termination under subsection (E). *See In re M.C.*, 917 S.W.2d at 270. Nor is it necessary to establish that the parent's conduct was directed at the child or caused

actual harm; rather, it is sufficient if the parent's conduct endangers the child's well-being. *See Boyd*, 727 S.W.2d at 533; *Walker v. Tex. Dep't of Fam. & Protective Servs.*, 312 S.W.3d 608, 617 (Tex. App.—Houston [1st Dist.] 2009, pet. denied). Danger to a child's well-being may be inferred from parental misconduct. *Boyd*, 727 S.W.2d at 533; *In re K.P.*, 498 S.W.3d 157, 171 (Tex. App.—Houston [1st Dist.] 2016, pet. denied).

Endangering conduct does not have to occur in the child's presence. *In re K.P.*, 498 S.W.3d at 171. A parent's past endangering conduct may create an inference that past conduct may recur and further jeopardize the child's present or future physical or emotional well-being. *See In re D.M.*, 58 S.W.3d 801, 812 (Tex. App.—Fort Worth 2001, no pet.). "As a general rule, conduct that subjects a child to a life of uncertainty and instability endangers the physical and emotional well-being of a child." *In re R.W.*, 129 S.W.3d 732, 739 (Tex. App.—Fort Worth 2004, pet. denied).

Laura argues that, while the allegations against her fall within categories of conduct that have led to termination of parental rights in other cases, the evidence in support of termination for endangerment was legally and factually insufficient to meet the "clear and convincing" standard in this case. For example, she argues that the Department failed to provide context for her failed drug tests or to establish that a failed hair-analysis drug test taken more than a month after a passed urinalysis drug

21

test is indicative of new drug use. *Cf. In re K.P.M.*, No. 01-17-00327-CV, 2017 WL 5353244, at *2 (Tex. App.—Houston [1st Dist.] Nov. 10, 2017, pet. denied) (mem. op.) (discussing expert testimony on what hair-follicle drug test reveals about historical ingestion of and exposure to drug for specified amount of time). Laura focuses her discussion of the failed drug tests on instances in which she tested positive for marijuana use. And she argues that the Department failed to link her marijuana use to any impairment of her ability to care for her children.

The Department presented evidence that Laura failed multiple drug tests between October 2017 and May 2018. The Texas Supreme Court has held that "a parent's use of narcotics and its effect on his or her ability to parent may qualify as an endangering course of conduct." *In re J.O.A.*, 283 S.W.3d at 345); *see In re M.E.-M.N.*, 342 S.W.3d 254, 263 (Tex. App.—Fort Worth 2011, pet. denied) ("Drug use and its effect on a parent's ability to parent may establish an endangering course of conduct."); *Toliver v. Tex. Dep't of Family & Protective Servs.*, 217 S.W.3d 85, 98 (Tex. App.—Houston [1st Dist.] 2006, no pet.); *In re U.P.*, 105 S.W.3d 222, 233 (Tex. App.—Houston [14th Dist.] 2003, pet. denied) ("Endangerment may include evidence of drug addiction and its effect on a parent's life and his ability to parent.").

The record includes evidence that Laura tested positive for marijuana at Scott's birth. She tested positive eight months later for marijuana metabolites, phencyclidine, and cocaine just after Ian, Tracy, and Scott were removed. At the

time of that failed drug test, Laura was three months pregnant. Five months later, in March 2018, she tested positive for methamphetamine and cocaine. The record is silent on whether she was still pregnant at the time of the March 2018 test. Thus, the record establishes at least two instances of positive drug test results while pregnant. Laura's drug use was not limited to marijuana. Laura tested positive for phencyclidine and cocaine while pregnant.

Illicit drug use by a parent during her pregnancy can support a firm belief or conviction that the parent has engaged in endangering conduct. *See In re S.I.–M.G.*, No. 02-12-00141-CV, 2012 WL 5512372, at *9 (Tex. App.—Fort Worth Nov. 15, 2012, no pet.) (mem. op.); *In re M.L.B.*, 269 S.W.3d 757, 760 (Tex. App.—Beaumont 2008, no pet.); *Dupree v. Tex. Dep't of Protective & Regulatory Servs.*, 907 S.W.2d 81, 84 (Tex. App.—Dallas 1995, no writ). A factfinder reasonably could have formed a firm conviction or belief that Laura engaged in endangering conduct by ingesting phencyclidine and cocaine while pregnant with her seventh child and caring for Ian and his younger brother and sister.

In addition to the illicit drug use during pregnancy, the facts surrounding Scott's injuries, if better detailed in trial evidence, might also support termination for endangering conduct under Subsection (E). On this record, though, we cannot say that the Department proved that they did to the level necessary to satisfy the clear-and-convincing evidentiary standard. *See* TEX. FAM. CODE § 161.001(b)

23

(applying clear-and-convincing standard to predicate findings in parental-termination suits). There is nothing in the record from which a factfinder could have evaluated the swelling and bruising that was noted when Scott was treated for a skull fracture. The severity and age of the swelling and bruising is unknown. The evidence is silent on whether the swelling and bruising might or might not be consistent with typical injuries suffered by crawling children, distinct from the skull fracture. It is not that such evidence did not exist. Undoubtedly, Scott has medical records. But the medical records were not included in the trial evidence. The Department did not present medical records, medical testimony, or any other form of evidence from which to evaluate Scott's injuries. The undeveloped references to injuries provided in this case do not meet the clear-and-convincing standard for termination under Subsection (E). For this reason, we do not include Scott's injuries in our Subsection (E) analysis.

There is clear and convincing evidence that Laura knowingly used illicit drugs during pregnancy. The evidence is sufficient to support the trial court's judgment terminating Laura's parental rights to Ian under Subsection (E).

Because we have determined that sufficient evidence supports termination under at least one predicate that could underlie a future Subsection (M) termination, we see no basis for addressing the other. We overrule Laura's second issue appealing termination under Subsection (O) and the portion of her third issue appealing

24

termination under Subsection (E). We do not address termination under Subsection (D). We turn now to best interest.

## C.    Best-interest finding

In addition to a predicate violation, the Department must establish by clear and convincing evidence that termination is in Ian's best interest. TEX. FAM. CODE § 161.001(b)(2). There is a strong presumption that a child's best interest will be served by preserving the parent-child relationship. *In re J.F.C.*, 96 S.W.3d at 294; *see* TEX. FAM. CODE § 153.131(b). Because of the strong presumption that maintaining the parent-child relationship is in the child's best interest and the due process implications of terminating a parent's rights without clear and convincing evidence that termination is in the child's best interest, "the best interest standard does not permit termination merely because a child might be better off living elsewhere. Termination should not be used to merely reallocate children to better and more prosperous parents." *In re W.C.*, 98 S.W.3d 753, 758 (Tex. App.—Fort Worth 2003, no pet.) (citation omitted); *see In re E.N.C.*, 384 S.W.3d 796, 809 (Tex. 2012).

A factfinder may consider a number of factors to determine the child's best interest, including the child's desires, the child's present and future physical and emotional needs, the present and future emotional and physical danger to the child, the parental abilities of the people seeking custody, programs available to assist

those people in promoting the child's best interest, plans for the child by those people or by the agency seeking custody, the acts or omissions of the parent that may indicate that the existing parent-child relationship is not appropriate, and any excuse for the acts or omissions of the parent. *Holley v. Adams*, 544 S.W.2d 367, 371–72 (Tex. 1976).

The absence of evidence on some factors does not preclude a factfinder from reasonably forming a strong conviction or belief that termination is in the child's best interest. *In re C.H.*, 89 S.W.3d 17, 27 (Tex. 2002). The absence of evidence cannot be used as if it were clear and convincing evidence supporting a termination finding. *In re E.N.C.*, 384 S.W.3d at 808. In some cases, undisputed evidence of only one factor may be sufficient to support a finding that termination is in the child's best interest; in other cases, there could be "more complex facts in which paltry evidence relevant to each consideration mentioned in *Holley* would not suffice" to support termination. *Id.* Our "best interest" analysis is not limited to these *Holley* factors; other factors may be considered. *Holley*, 544 S.W.2d at 372.

"A best-interest analysis may consider circumstantial evidence, subjective factors, and the totality of the evidence as well as the direct evidence." *In re E.D.*, 419 S.W.3d 615, 620 (Tex. App.—San Antonio 2013, pet. denied). "A trier of fact may measure a parent's future conduct by [her] past conduct and determine whether termination of parental rights is in the child's best interest." *Id.*

### 1.     Child's desires

The trial court received evidence that Ian has established a bond with his foster family and that it would "break his heart" to leave them. There was no other evidence on the issue.

### 2.     Child's present and future physical and emotional needs and danger

Ian has learning issues that require educational accommodations. The record suggests—though it is less than clear—that these learning issues were not discovered until Ian came under the Department's care, meaning they had not been identified while he was under Laura's care. Laura has not been able to keep Ian in the same school long enough to complete a school year. Frequent transfers between schools could be expected to interfere with efforts to establish classroom accommodations and other interventions to address Ian's dyslexia and meet his educational needs.

The Department's caseworker testified that Ian receives play therapy. She did not explain the issues being addressed through play therapy or the anticipated length of time that such therapy would be necessary.

Ian has ongoing severe dental decay that has required multiple dental visits and a scheduled dental surgery. The Department did not present any testimony or treatment records from Ian's dental providers to establish the cause of Ian's tooth decay. Either way, the record indicates that the decay was not being adequately addressed before Ian's removal from Laura's care. After the Department was named

27

his managing conservator, a dental evaluation led to the removal of several teeth and caps being placed over several other teeth. The dental care was required to address mouth pain and difficulty eating.

This evidence suggests that Ian has specialized needs that likely would require more than a basic level of parental attentiveness and diligence. *See In re L.G.R.*, 498 S.W.3d 195, 205 (Tex. App.—Houston [14th Dist.] 2016, pet. denied) (considering particular medical needs of child, parent's past inability to meet those needs, and parent's lack of understanding and resolve to meet future medical needs, in evaluating best interest).

### 3.   Parenting abilities of people seeking custody

The Department presented evidence that Laura ingested phencyclidine and cocaine while pregnant, failed to address severe tooth decay in two of her children, and failed to provide a stable educational environment for Ian, who has documented learning issues and requires educational intervention. Moreover, the Department became involved because Scott suffered a skull fracture while in Laura's care. The Department determined there was "reason to believe" that Laura was neglectful and abusive to Scott based on his injuries.

Laura presented no evidence of her parenting ability.

Ian's foster mother testified that she is providing a stable and loving home for Ian. She has enrolled him in extra-curricular activities. She also has set up weekly

28

tutoring for Ian to address his educational needs. The Department presented evidence that the foster mother's parenting abilities are adequate to meet Ian's needs.

### 4. Available programs for conservators to promote best interest of child

Laura was provided access to programs to meet her family services plan requirements. She did not complete any of the services offered, including counseling, parenting classes, and drug-treatment programs. There may be additional, available programs that would benefit Laura, but she has not shown an ability to engage in these programs until completion.

### 5. Parent's and the Department's plans for the child

Laura did not testify or offer any evidence on her plans for Ian. As stated, Laura has moved frequently. She has not shown an ability to maintain steady housing for her children. During the pendency of the case, she moved between shelters and relatives' homes in Texas and Louisiana. There is no evidence that Laura has a plan for Ian that can adequately address his needs.

The Department caseworker testified that Ian is in an adoptive placement. Ian's foster mother testified that she has enrolled Ian in school and extracurricular activities. She loves him, plans to adopt him, and is committed to providing him with a safe and stable home. She also is seeking to adopt Tracy and is committed to maintaining Ian's and Tracy's bond with Scott, who has a separate placement.

29

**6. Parent's acts or omissions that may indicate that the existing parent-child relationship is not a proper one and any excuse for those acts or omissions**

Ian's younger brother, Scott, suffered a skull fracture while under Laura's care. Laura offered an explanation for the injury, but, according to the evidence admitted at trial, the emergency room physicians thought abuse was the "likely" cause of his injury. According to the Department, there was "reason to believe" Laura was neglectful and abusive based on Scott's injuries.

Laura did not obtain necessary dental care for the severe tooth decay that developed. When Ian was removed from her care, he had mouth pain and difficulty eating because of the extensive decay. This evidence suggests that Laura has not adequately addressed her children's needs.

Additionally, Laura tested positive for multiple drugs while pregnant and caring for three young children. Laura provides no explanation for her drug use other than to minimize its severity by focusing on her marijuana use. But her failed drug test while three months pregnant revealed illegal drug use that went beyond marijuana use—she tested positive for phencyclidine and cocaine as well.

**7. Conclusions on best interest**

Considering the evidence in light of these *Holley* factors, we conclude that a reasonable factfinder could have formed a firm belief or conviction that termination of Laura's parental rights was in Ian's best interest. We therefore conclude that the

evidence was sufficient to support the trial court's best interest finding. *See In re J.D.G.*, No. 01-18-00578-CV, 2018 WL 6520345, at \*10–12 (Tex. App.—Houston [1st Dist.] Dec. 11, 2018, no pet.) (analyzing *Holley* factors and determining that, on balance, evidence supported trial court's judgment that termination of mother's parental rights was in children's best interest). We overrule Laura's first issue.

**D.     Challenge to evidentiary value of factual assertions contained in clerk's record documents**

Laura asserts that the clerk's record contains documents that include various factual assertions for which the Department failed to present supporting evidence during trial. She argues that the factual assertions are not evidence for purposes of our sufficiency review.

Our review of the evidence as it related to the predicate findings and the best interest finding was limited to that presented at trial and admitted into evidence without objection. Because there was legally and factually sufficient evidence to support the trial court's judgment without the additional factual assertions in the clerk's record, we overrule Laura's fourth issue as moot.

## Conclusion

We affirm.

Sarah Beth Landau
Justice

Panel consists of Justices Keyes, Higley, and Landau.